STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-687

STATE OF LOUISIANA

VERSUS

FAHIM A. SHAIKH

**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. 2014-313
HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

Thibodeaux, Chief Judge, dissents in part and assigns written reasons.

AFFIRMED IN PART, REVERSED IN PART,
VACATED IN PART, AND REMANDED.

**Annette Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, Louisiana 70602-1747**
**(337) 436-2900**
**Counsel for Defendant/Appellant:**
          **Fahim A. Shaikh**

**James R. Lestage**
**District Attorney**
**Thirty-Sixth Judicial District**
**Post Office Box 99**
**DeRidder, Louisiana 70634**
**(337) 463-5578**
**Counsel for Appellee:**
          **State of Louisiana**

**KEATY, Judge.**

Defendant, Fahim A. Shaikh, appeals his convictions and sentences for simple kidnapping and indecent behavior with a juvenile. For the following reasons, Shaikh's convictions and sentences are affirmed in part, reversed in part, vacated in part, and remanded.

## FACTS AND PROCEDURAL BACKGROUND

In this criminal matter, the thirteen-year-old victim, A.G.,[1] was at her house on the morning of April 17, 2014, when her mother, Mitzi Gormanous, left with her older daughter and grandson to go shopping. A.G. did not go shopping because she was punished for inappropriate behavior. When they returned approximately an hour and a half later, A.G. was gone. This was the second time that A.G. had run away according to her mother, and following a brief search, Gormanous called the sheriff's office and reported A.G. as a runaway. A.G. was found later that day when she went to the sheriff's station with Mrs. Judith Knox.

Mrs. Knox was the grandmother of her friend, Alexis Knox, and with whom Alexis lived. A.G.'s trial testimony indicates that on the morning in question, she planned on running away to Alexis's house. As such, she packed a bag with her clothes and began walking towards her destination. As she was walking, Shaikh, who was driving his car, stopped and asked A.G. if she needed a ride. A.G. obliged and asked to be taken to Alexis's house. Since Alexis was not going to be home until later that day, Shaikh and A.G. went to the Dairy Queen drive-through to get food, went to Shaikh's friend's apartment, ran other errands, and finally

---

[1] The victim's initials are used to protect the victim's identity as required by La.R.S. 46:1844(W).

ended up at Alexis's house. A.G. alleged that during this time, Shaikh kissed her cheek, tickled her, slapped her butt, and professed his love for her.

As a result, Shaikh was charged on June 12, 2014 with one count of simple kidnapping, a violation of La.R.S. 14:45, and one count of indecent behavior with a juvenile, a violation of La.R.S. 14:81. Following a three-day jury trial which began on February 23, 2014, Shaikh was convicted as charged. Shaikh subsequently filed a Motion for New Trial and a Motion for Post-Verdict Judgment of Acquittal Pursuant to Code of Criminal Procedure Article 821, which the trial court summarily denied on April 2, 2014.

On April 13, 2014, Shaikh was sentenced to five years, with two years suspended, on the simple kidnapping conviction. As to the indecent behavior with a juvenile conviction, he was sentenced to seven years with three years suspended. Both sentences were ordered to be served concurrently with Shaikh receiving credit for time served, for a total of four years of incarceration and five years of supervised probation upon release. He was also ordered to pay a fine of $2,500 on each count, plus court costs. The general conditions of probation were ordered, along with $500 to be paid to the Criminal Court Fund, $300 for cost of prosecution, and $300 to the Public Defender's Fund. The fines, fees, and costs were ordered by the trial court to be paid on a twenty-four month payment plan. Shaikh subsequently filed a Motion to Reconsider Sentence which was denied by the trial court on May 4, 2015. Shaikh appealed.

On appeal, Shaikh asserts the following five assignments of error:

I)     The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that Appellant, Fahim Shaikh, committed simple kidnapping of A.G., a thirteen[-]year-old juvenile.

II)     The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that Appellant, Fahim Shaikh, committed indecent behavior of A.G., a thirteen[-]year-old juvenile.

III)     Fahim Shaikh was subjected to double jeopardy when he was convicted of both the offense of simple kidnapping and the offense of indecent behavior with a juvenile from the same course of criminal conduct.

IV)     The trial court erred in denying Mr. Shaikh's motion for mistrial and in permitting the prosecution to elicit information about Mr. Shaikh's immigration status as well as his incarceration.

V)     The maximum sentences imposed upon Fahim Shaikh, although partially suspended, are excessive and are in violation of the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution.

## DISCUSSION

### I.     Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent, and the minute entry of the sentencing proceeding and the commitment order are in need of correction. However, these errors are rendered moot due to our reversing and vacating Shaikh's indecent behavior with a juvenile conviction and sentence.

### II.     Simple Kidnapping

In his first assignment of error, Shaikh contends that the evidence was insufficient to prove that he committed simple kidnapping. When the sufficiency of evidence claim is raised on appeal, the following inquiry is utilized by the reviewing court:

> [W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Thacker*, 13-516, p. 5 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, 804

(quoting *State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d

578, 580).

> Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon*, 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id*. at 936.

*Id*. (quoting *State v. F.B.A.*, 07-1526, pp. 1-2 (La.App. 3 Cir. 5/28/08), 983 So.2d

1006, 1009, *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138).

Simple kidnapping is defined in La.R.S. 14:45(A), in pertinent part, as:

(2) The intentional taking, enticing or decoying away, for an unlawful purpose, of any child not his own and under the age of fourteen years, without the consent of its parent or the person charged with its custody.

In this case, there is no dispute that A.G. was under the age of fourteen years

old and that Shaikh did not have Gormanous's consent. The only issue, therefore,

is whether the evidence and testimony presented at trial shows, beyond a

reasonable doubt, that Shaikh committed the "intentional taking, enticing or decoying away, for an unlawful purpose." *Id.*

At trial, the State's witness, Mrs. Knox, testified that she lived with her husband and three grandchildren: thirteen-year-old Alexis;[2] twelve-year-old Haleah; and eleven-year-old David. She revealed that she knew A.G. through her grandchildren and that on April 17, 2014, A.G. appeared at her house "[w]hen some guy dropped her off and waited for her to see if she could stay with us." Mrs. Knox stated that A.G., who was crying, scared, and pale, told her "that she was afraid and [that] she ran away." According to Mrs. Knox's testimony, A.G. also told her that she did not want to return home. Mrs. Knox testified that she gave A.G. two choices: that she needed to call her mother or call the sheriff's department. Mrs. Knox indicated that A.G. called the sheriff's department, where she and Mrs. Knox subsequently went for questioning.

Mrs. Knox's testimony is supported by A.G.'s trial testimony that she ran away from home on the day in question. A.G. testified that she intended to run away to Alexis's house which was located at "Bundick Lake Road or Bundick Lake, Dry Creek." Her testimony reveals that she packed a bag containing her clothes, left her house on foot, and began walking to Highway 171. A.G. stated that when she reached Highway 171, she began walking towards DeRidder, Louisiana, and almost made it to the Dry Creek Highway when Shaikh, who was driving his car, approached her and asked her if she wanted a ride. A.G. testified that she got into his car, told Shaikh that she was going to Alexis's house, and Shaikh said he would take her there. A.G. stated that she told Shaikh that she was

---

[2] Although Mrs. Knox does not reveal Alexis's last name, we assume that it is Knox in light of A.G.'s trial testimony that she was running away to Alexis Knox's house.

thirteen years old, and he stated that he was twenty-five years old. On cross-examination, A.G. testified that when she initially got into Shaikh's car and he began driving, she told him that Alexis would not be home until four o'clock that afternoon. On cross-examination, she further testified that in response, Shaikh asked if she wanted to get something to eat since it was approximately 11:30 a.m. According to A.G.'s direct testimony, she responded "[y]es" which prompted Shaikh to turn around and proceed to Dairy Queen in DeRidder. Once they arrived at Dairy Queen, A.G. testified that they went to the drive-through and ordered food, which Shaikh paid for. She stated that after they received their food, Shaikh drove them to an apartment.

When they arrived at the apartment, A.G. testified that she sat on the couch and that Shaikh sat next to her and began to rub her inner leg between the knee and thigh. A.G. indicated that Shaikh quit rubbing her leg after she told him to stop and that he never touched her in that area again. Her testimony reveals that she had her cousin's cell phone in her possession during this time, although it could not make outgoing calls. A.G. testified that they talked about how her mother had forbidden her to dye her hair and that she and Shaikh subsequently proceeded to Wal-Mart where Shaikh bought her hair dye. A.G. indicated that after they returned to the apartment, Shaikh applied the dye to her hair, and as it was setting, he left the apartment for a short while. Her testimony reveals that Shaikh returned a few minutes later after she had washed out the hair dye. A.G. testified that they again sat on the couch, and Shaikh hugged her, kissed her on the cheek, and tickled her under the arm. She revealed that this behavior ceased when A.G. told him to stop. She indicated that Shaikh slapped her butt, and she became fearful when he invited her to remain at his apartment overnight. According to her testimony, A.G.

6

declined his invitation and asked Shaikh to bring her to Alexis's house. A.G. testified that he obliged and brought her there. On the way, she testified that Shaikh said she was pretty, he loved her, he wanted to meet up with her, and he gave her his phone number. A.G.'s testimony reveals that Shaikh never threatened her, never made her go to the apartment or return with him after they went to Wal-Mart, and that she never made an effort to escape. She also testified that Shaikh never tried to touch her breast or private area, make out with her, or have her perform any kind of acts on him.

The State also presented Deputy Randall Anderson of the Beauregard Parish Sheriff's Office at trial, who testified that when A.G. arrived at the police station with Mrs. Knox, she provided him with a voluntary written statement wherein she advised of all that occurred previously that day. Deputy Anderson indicated that A.G.'s written statement stated that Shaikh tickled her, rubbed her legs between her knee and hip, hugged her, slapped her butt, and kissed her on the cheek. Deputy Anderson indicated that he and Deputy Lance Grant subsequently attempted to locate Shaikh with A.G.'s help, who led them to the apartment complex although she could not remember the apartment's exact location. Deputy Anderson revealed that they returned to the sheriff's office when A.G. advised that she programmed Shaikh's phone number into her cousin's phone. He testified that he and Deputy Grant thereafter called and texted Shaikh from their phones, disguising themselves as A.G. and telling Shaikh that she was at a "Get and Go" convenience store and needed a ride home. Deputy Anderson testified that he subsequently arrested Shaikh after pulling him over on Highway 171, close to the convenience store.

Deputy Grant, another State witness, testified at trial and corroborated Deputy Anderson's testimony. Deputy Grant further testified that following their attempts at communicating with Shaikh, Shaikh called A.G. on Deputy Grant's cell phone, which Shaikh thought was A.G.'s cell phone. He testified that during this communication between the two, Shaikh advised that he was uncomfortable picking A.G. up from the convenience store. Deputy Grant indicated that Shaikh's attitude changed, however, when A.G. told him not to pick her up and that she was going to walk home; he then agreed to pick her up. Deputy Grant revealed that when Shaikh arrived at A.G.'s location, Deputy Grant ran up to Shaikh's car, which prompted him to quickly drive away. He testified, however, that Shaikh subsequently stopped when he saw Deputy Anderson in his police car.

Deputy Bobbie Ripley, a female sheriff's detective and another State witness, conducted a videotaped interview with A.G. on April 23, 2014. At trial, she testified that A.G.'s version of events was the same as the events she noted in her April 17, 2014 voluntary statement. Deputy Ripley submitted a supplemental report documenting her interview.

Abdul Majeed also testified on behalf of the State at trial, advising that he was the owner of a gas station and convenience store located in Merryville, Louisiana. Majeed revealed that he previously owned another store in Texas, where he used to live and during which time he met Shaikh, who briefly worked at his store. According to his testimony, after Shaikh stopped working for Majeed in Texas, they maintained a friendship. Majeed revealed that when he returned to Pakistan to visit family, he asked Shaikh, who was living and working in Baton Rouge, Louisiana, to take care of his Merryville store for four weeks. Majeed

testified that he allowed Shaikh to reside in his DeRidder apartment while he was in Pakistan.

To counter the State's witness testimony, Shaikh presented Apollo Varela, who testified that on the day in question, and at the same time that A.G.'s mother and sister were waiting in the lobby of the sheriff's station, he was also in the lobby as he had just been let out of jail and was waiting for a ride home. He revealed that when A.G. arrived, she informed her family that she had run away and that Shaikh did not inappropriately touch her.

Shaikh also testified at trial, stating that he managed Majeed's store while also managing a café/bakery in Baton Rouge. On the morning in question, Shaikh testified that he had opened Majeed's store, and, a few hours later, he left the store and proceeded down Highway 171 towards Sam's Club. Shaikh indicated that he never made it and turned back because he was tired. He revealed that after he turned around, he noticed A.G. hitchhiking and asked her if she needed a ride. Shaikh testified that A.G. said that she was going to a friend's house and gave him directions to get there. He stated that A.G. advised that her friend would not be home until later that day.

Shaikh testified that, because her friend would not be home until later in the day, he and A.G. went to Dairy Queen, made a deposit at the bank, and went to Majeed's apartment. He revealed that during a conversation at the apartment, A.G. stated that she was thirteen years old, that her mother drank heavily, and that she once had to drive her mother home. Shaikh stated that although he considered calling the police, he believed that it would prompt Child Protective Services to become involved. He revealed that he did not want A.G.'s parents involved in such a situation should A.G.'s allegations be false. Shaikh stated that he thereafter

proceeded upstairs to prepare taxes while A.G. remained downstairs watching television. He testified that approximately an hour and a half passed when he told A.G. that he had to leave to go to the tax office. Shaikh testified that she wanted to go with him, and during their trip, they stopped to buy hair dye at Wal-Mart. He indicated that he told A.G. to use the dye at her friend's house given her previous statement to him that her mother had forbidden her from dying her hair. Shaikh revealed that they never made it to the tax office as he had to return to the apartment because he forgot the checks. Shaikh testified that A.G. stayed at the apartment when he left again to go to the tax office and that when he returned, she had dyed her hair. He then took her to her friend's house.

Shaikh testified that when he dropped A.G. off at her friend's house, she seemed normal and that she asked for his number, advising that she would call him for a ride if she had to walk back home the following Monday. He stated that he gave her his cell phone number and left to go to work at Majeed's store. Shaikh explained that he reluctantly agreed to pick A.G. up after work that same day following several phone calls from her as he had to drive to Baton Rouge that evening to open the bakery the following morning. He testified that when he got to the "Get and Go" convenience store where he was to meet with A.G., a man rushed up to his car with a flashlight, leading him to believe that he had been set up to be robbed. As a result, he testified that he sped away, quickly realizing, however, that it was the police. He testified that he pulled over.

Shaikh testified that he never touched A.G., professed his love for her, or acted inappropriately. He stated that he initially believed she was a salesperson when he saw her hitchhiking with a suitcase. Shaikh testified that A.G. never told

10

him she was a runaway, and he denied that he told her he was only twenty-five years old. He testified that he was forty-one years old, married, and had one son.

After hearing the above testimony, the jury believed A.G.'s testimony rather than Shaikh's testimony given its guilty verdict. Thus, the jury believed that there lacked a lawful purpose and/or consent, which is both required to prove simple kidnapping. Similarly, the trial court agreed with the jury by stating the following at the sentencing hearing on April 13, 2015:

> The defense has, obviously, argued that the sentence should be one of leniency in this matter, maintaining their position that Mr. Shaikh was simply trying to help this young lady.
>
> Well, let me dispel that situation. I do not find the evidence -- I do not find that that version of events is what happened on this occasion. I heard all of the evidence, and I do not feel that Mr. Shaikh thought that this was a traveling salesperson. I believe that more likely the situation that was described is that Mr. Shaikh saw this young girl walking down the side of the road and made an intentional decision to turn around.
>
> And, thankfully for this young lady, Mr. Shaikh is a very meek and mild-mannered person who only took this as far as the young victim allowed it to go. And my belief is that . . . Mr. Shaikh would have taken this as far as the young victim would have allowed it to go.
>
> . . . .
>
> But I want to make the record clear that I do not believe Mr. Shaikh's version of events that he was just trying to be a good citizen in this matter. I think, fortunately for this young lady, Mr. Shaikh was not a forceful child molester or rapist, or else we could be dealing with a much different situation.

We agree with the jury and trial court's holding. Shaikh argues, however, that the State failed to prove that the alleged taking was for an unlawful purpose by citing *State v. Belcher*, 34,616 (La.App. 2 Cir. 6/20/01), 793 So.2d 262, 267, wherein the second circuit held:

> The Legislature, in proscribing "taking, enticing or decoying away" of children, obviously did not intend to include in the proscription

> actions undertaken for a lawful purpose (such as, for example, giving children a ride to school on a rainy day), even when done without the consent of the parents. However, the State, in order to satisfy its burden of proof by sufficient evidence, need not establish the exact nature of defendant's intent or purpose, but rather need only negate the existence of any lawful purpose. *State v. Gill*, 441 So.2d 1204 (La.1983).

We find that *Belcher's* example of "giving children a ride to school on a rainy day" without parental consent equates to a lawful purpose is completely different than and fails in comparison to the facts of the instant case. Specifically, picking up a runaway minor girl and keeping her secreted for five hours without her legal guardian's consent, as in the instant case, does not equate to a lawful purpose.

Shaikh argues, however, that the State failed to negate the existence of a lawful purpose since A.G. voluntarily went with Shaikh. We find that Shaikh's argument is without merit since A.G. lacked the capacity to consent as illustrated in *State v. Bates*, 05-315, p. 6 (La.App. 1 Cir. 11/4/05), 927 So.2d 417, 420 (citations omitted), wherein the appellate court stated the following with respect to the consent element in simple kidnapping:

> An essential element of [simple kidnapping] is that the forcible seizing and carrying of the victim be without his consent. And every element of a crime must be proven beyond reasonable doubt before a conviction can be upheld. Because the victim was an infant, however, he could neither grant nor deny consent to his being seized and carried. That consent had to come from or be denied by a legal custodian.

Although A.G. was thirteen years old at the time of the incident and not an infant like in *Bates*, the same proposition applies regarding consent. Specifically, even though A.G. voluntarily agreed to enter Shaikh's car, she had no legal authority in her capacity as a minor to consent to getting into Shaikh's car. "That consent had to come from or be denied by [A.G.'s] legal custodian." *See Id.* at 420. Thus, the State proved that an unlawful purpose existed by virtue of A.G.'s age and her lack

of capacity to consent to entering Shaikh's vehicle and being secreted for five hours.

Based on the above and in the light most favorable to the State, we find that there is sufficient evidence supporting Shaikh's simple kidnapping conviction. Accordingly, the trial court's judgment is affirmed in this regard.

## III.    Indecent Behavior

In his second assignment of error, Shaikh contends that the evidence was insufficient to prove that he committed indecent behavior with a juvenile. Indecent behavior with a juvenile is defined, in pertinent part, as:

> [T]he commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:
>
> (1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child's age shall not be a defense[.]

La.R.S. 14:81(A)(1).

> Indecent behavior with a juvenile is a specific intent crime for which the State must prove the offender's intent to arouse or gratify his sexual desires by his actions involving a child. Specific intent to commit indecent behavior with juveniles need not be proven as fact, but may be inferred from the circumstances and actions of the defendant.

*State v. Anderson*, 09-934, p. 7 (La.App. 5 Cir. 3/23/10), 38 So.3d 953, 958, *writ denied*, 10-908 (La. 11/12/10), 49 So.3d 887.

In this case, it is undisputed that an age difference of greater than two years existed between Shaikh and A.G. The only issue, therefore, is whether the State proved that Shaikh committed "[a]ny lewd or lascivious act upon . . . or in the presence of" A.G with the "intent to arouse or gratify his sexual desires by his actions involving" A.G. La.R.S. 14:81(A)(1); *State v. Anderson*, 38 So.3d at 958.

13

Lewd and lascivious has been defined as "'an act upon the person of a juvenile which is lustful, obscene, indecent, tending to deprave the morals in respect to sexual relations, and relating to sexual impurity or incontinence carried on in a wanton manner.'" *State v. Interiano*, 03-1760, p. 7 (La. 2/13/04), 868 So.2d 9, 15 (quoting *State v. Holstead*, 354 So.2d 493, 498 (La.1977)). We, therefore, look to the law, evidence, and testimony presented at trial to determine whether any rational trier of fact could have found the essential elements of indecent behavior with a juvenile proven beyond a reasonable doubt.

We discussed the sufficiency of the evidence claim with respect to the crime of indecent behavior with a juvenile in *State v. Rideaux*, 05-446 (La.App. 3 Cir. 11/2/05), 916 So.2d 488, wherein the defendant was convicted of molestation of a juvenile of two different victims. We found that while there lacked sufficient evidence to support the molestation charge with respect to the first juvenile victim, the evidence supported charging the defendant with the lesser included offense of indecent behavior with the first juvenile victim. As to the second juvenile victim, we found that there was insufficient evidence supporting both the molestation charge and indecent behavior with a juvenile. In our holding, we noted the second juvenile victim's testimony that there was only one incident of touching which occurred as follows:

> She stated that she and her sister were watching television and her mother told her to go to bed, but she fell asleep on the couch. She awoke when Defendant began rubbing her feet. She said that he unsnapped her bra and rubbed her back, and the area under her armpits. During the taped interview, she stated he rubbed the top of her butt, but at trial she indicated he rubbed all of her butt. When she got up and left the room, the activity ceased without words. [The second juvenile victim] was in her home, with two other adults, including her mother, present. She testified at trial and during the taped interview that the only words spoken during this time were when, while he was rubbing her head, Defendant said, "Oh, you had a

> headache. I knew my baby girl had a headache and I just wanted you—to make you feel better." There was no evidence that he told her not to tell anyone about the contact.

*Id*. at 495.

We reached our conclusion in *Rideaux*, 916 So.2d at 496, by reviewing prior jurisprudence interpreting lewd and lascivious behavior and other examples wherein the offender's intent was found to arouse or gratify his sexual desires by his actions, as follows:

> In *State v. Louviere*, 602 So.2d 1042, 1044 (La.App. 4 Cir. 1992), *writ denied*, 610 So.2d 796 (La.1993) (citations omitted), wherein the defendant was convicted of two counts of indecent behavior with a juvenile . . . :
>
> . . . .
>
> In that case, two nine-year-old girls testified that the seventy-two-year-old defendant asked them to kiss him to see if his breath smelled like chicken and that he attempted to put his tongue in their mouths when they did so. There were no other touches or suggestions of a sexual nature. Our colleagues on the fourth circuit held that without more, although disgusting, there was no evidence that he committed a lewd and lascivious act with the intent to arouse or gratify sexual desires.

The fourth circuit in *Louviere* reversed the trial court's conviction of indecent behavior with a juvenile based upon insufficient evidence.

We also looked at *State v. Bugbee*, 34,524 (La.App. 2 Cir. 2/28/01), 781 So.2d 748, wherein "the defendant was convicted of indecent behavior with two juveniles. They testified that he repeatedly touched their breasts and buttocks. Affirming the convictions, the second circuit stated that '[o]ne touch may be an accident, but 8 to 13 times indicate a plan.'" *Rideaux*, 916 So.2d at 497 (quoting *Bugbee*, 781 So.2d at 756). We also reviewed *State v. Breaux*, 02-382 (La.App. 5 Cir. 10/16/02), 830 So.2d 1003, wherein the defendant was convicted of indecent behavior when, while sitting with the victim in the back seat of a car, "he put his

fingers between her legs and touched her vagina. When she opened her mouth to call to her mother in the front seat, he covered her mouth with his hand. The fifth circuit found his act of covering her mouth an indication of his intentions." *Rideaux*, 916 So.2d at 498.

After reviewing *Louviere*, *Bugbee*, *Breaux*, and other jurisprudence, we held that the evidence in *Rideaux* was insufficient to support the indecent behavior conviction with respect to the second juvenile victim by stating:

> In the present case, unlike Defendant warning [the first juvenile victim] not to tell anyone, Defendant did not say a word to [the second juvenile victim] as she left the room. Unlike *Bugbee*, there were no repeated acts, thus, no indication of a plan. There was no kissing, touching of the genitals as in *Breaux*, or attempts to prevent others from knowing about the incident. Other adults were present in the home, and there was nothing to suggest a sexual agenda. While Defendant's actions may have been inappropriate, especially unhooking [the second juvenile victim's] bra, we find that the State failed to prove his actions were "lewd or lascivious" or done with "the intention of arousing or gratifying the sexual desires of either person" beyond a reasonable doubt.

*Rideaux*, 916 So.2d at 498.

In the instant matter, the State alleges that the following acts allegedly committed by Shaikh qualified as indecent behavior: rubbing A.G.'s leg, hugging and kissing her on her cheek, slapping A.G.'s butt as she stood up from sitting on the couch, and attempting to tickle her. A.G.'s testimony shows, however, that Shaikh's foregoing behavior ceased when she instructed him to stop. There lacks testimony indicating that Shaikh attempted to get A.G. to touch him in a sexual way or that he tried to touch her breast or genitals. There lacks testimony indicating that Shaikh made sexual remarks or inappropriate suggestions, or that he tried to take off her clothes.

16

Rather, A.G.'s testimony shows that when Shaikh dropped her off at the Knox home, he waited to see if her friend was there before leaving, and she said nothing to Mrs. Knox before she walked back out to Shaikh's car to tell him she could stay there. Despite Mrs. Knox's testimony indicating that A.G. was pale and crying upon arrival, when questioned if A.G. told her why she was crying, Mrs. Knox stated: "Just that she was afraid and she ran away." Mrs. Knox testified, however, that A.G. did not want to return home and wanted to stay at Mrs. Knox's house because "she felt safe there, and she said she wouldn't be afraid and that she just would feel safer there."

Accordingly, we find none of the acts the State relied upon are "lewd or lascivious" nor committed with the "intent to arouse or gratify [Shaikh's] sexual desires." La.R.S. 14:81(A)(1); *Anderson*, 38 So.3d at 958. Similar to *Rideaux*, where the defendant's act of unhooking the juvenile victim's bra and rubbing her naked back, under her arms, and butt may have been inappropriate, the leg rubbing, attempted tickle, and hugging and kissing the cheek of a juvenile victim he did not know, in the current case, did not prove Shaikh acted with the specific intent to arouse or gratify his sexual desire. Thus, his conviction for indecent behavior with a juvenile is reversed, and his sentence is vacated.

## IV. Double Jeopardy

In his third assignment of error, Shaikh contends that his convictions for simple kidnapping and indecent behavior with a juvenile constitute double jeopardy since they arise from the same course of criminal conduct. Considering our holding reversing and vacating Shaikh's indecent behavior with a juvenile conviction and sentence, we find that this assignment of error is moot.

## V.     Mistrial

In his fourth assignment of error, Shaikh contends that the trial court erred in permitting the State to question him regarding his immigration status, over his counsel's objection, as it had no bearing on whether he was guilty of simple kidnapping.  Shaikh alleges that the improper admission of this evidence prejudiced the jury, making it impossible for it to make an impartial determination.

At trial and prior to Shaikh's testimony, defense counsel attempted to limit the State's ability to question him regarding his immigration status and possible deportation by stating that it was irrelevant.  The State argued at trial that it had a right to full cross-examination in order to show any biases, which included Shaikh's immigration status.  The trial court allowed the questioning, finding that if Shaikh was facing deportation, it could be relevant as to his truthfulness.

At trial, the defense questioned Shaikh regarding his background, including his birthplace.  The State cross-examined Shaikh regarding his initial immigration status when he first came to the United States.  In response, Shaikh testified that he was born in Pakistan although he came to the United States in June 1999 on a fiancé visa, meaning that he was engaged to a United States citizen.  He further testified that his fiancé, and later his first wife, was from Pakistan although she was a United States citizen.  Shaikh stated that they were married in California in July 1999, although they subsequently divorced in 2001.  He testified that he married his second wife, also a United States citizen, in 2003 and together they produced one child.

The State thereafter extensively questioned Shaikh regarding his current immigration status, which Shaikh stated was "out-of-status," which is different than being in the United States illegally.  More specifically, he testified that he

obtained work permits which enabled him to stay in this country legally, although they had to be renewed annually. He indicated that he had not renewed his work permits since 2009, as it was costly and he did not have the money. Shaikh further testified that although he knew that he could be deported if he was convicted of a felony, the risk of deportation had no impact on his testimony.

Following the foregoing colloquy between the State and Shaikh, the trial court stated:

> Ladies and gentlemen of the jury, I'm going to instruct you that the testimony of Mr. Shaikh as to any bias that he may have in truthfulness or untruthfulness is purely up to the jury to determine; but I want to make sure that I'm clear that the legal status of Mr. Shaikh as a U. S. citizen or not or whether he is legally or illegally or somewhere in between in this country is not to be considered in any way, shape, or form. He is entitled to the same benefits under the law under our criminal justice system, regardless of any of those status determinations that you make or don't make.
>
> So I just want to make sure that the jury understands that, for other purposes, the State and the defense can argue about how those things may affect his testimony and believability or unbelievability; but as far as the rights that he is entitled to under our law of innocence, presumption of innocence, a fair trial, and all of those things do not have anything to do with where he's from, whether he's a U. S. citizen or not, whether he's legally here are [sic] not legally here, what his religious beliefs are or are not.

We start our analysis by examining relevant evidence, which is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401. "We will not disturb the trial court's ruling as to the admissibility of such evidence in the absence of a clear showing of abuse of discretion." *State v. Shelton*, 11-22, p. 17 (La.App. 3 Cir. 9/28/11), 75 So.3d 512, 522, *writ denied*, 11-2405 (La. 3/9/12), 84 So.3d 552. Relevant evidence may be excluded, however, "if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.Code Evid. art. 403.

In his brief, Shaikh contends that his immigration status is irrelevant with respect to his determination of guilt, and that its admission was prejudicial and not indicative of his credibility. Shaikh argues that the admissibility of evidence regarding immigration law violations depends on the facts and circumstances of the case at issue, citing federal jurisprudence found in *United States v. Almeida-Perez*, 549 F.3d 1162, 1174 (8th Cir. 12/16/08) (emphasis added), wherein the Eighth Circuit held:

> We have found two cases in which unlawful entry into the country or other violation of immigration laws was considered admissible because relevant to truthfulness. *United States v. Cardales*, 168 F.3d 548, 557 (1st Cir.1999); *United States v. Cambindo Valencia*, 609 F.2d 603, 633-34 (2d Cir.1979). At the same time, we must say that the **use of such evidence is fraught with the danger of prejudice to a defendant by introducing the possibility of invidious discrimination on the basis of alienage.** *See* Fed.R.Evid. 403. Moreover, the **relevance of an immigration violation to character for truthfulness is at the least debatable and would depend on the facts of the particular violation since many immigration violations do not involve a false statement**. *See Figeroa v. United States INS*, 886 F.2d 76, 79 (4th Cir.1989) ("An individual's status as an alien, legal or otherwise, does not entitle the [Board of Immigration Appeals] to brand him a liar."); *see generally* 3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 6:33 (3d ed.2007).

Shaikh also cites *Molina v. Perez*, 2015 WL 249024, p. 8 (D. Kan. 1/20/15), another federal case, for the proposition that "[e]vidence of specific conduct related to immigration status bearing on untruthfulness, but not merely the status

itself, may be inquired into on cross-examination under [Federal] Rule [of Evidence Article] 608(b)."[3]

In opposition, the State argues that by taking the stand, Shaikh is subject to cross-examination on any matter that may be relevant to his truthfulness, bias, interest in the outcome of the trial, corruption, or other matter that tends to discredit his testimony. With respect to asking anything relevant regarding truthfulness, the State cites several evidence articles regarding the scope of cross-examination and attacking and supporting witness credibility, including who may attack credibility, the time for attacking and supporting credibility, and attacking credibility intrinsically and extrinsically. *See* La.Code Evid. arts. 607(A)-(D); 611(B).

Neither the State nor Shaikh, however, has offered, nor have we found, a Louisiana criminal case that is factually similar to the instant matter. A civil case with a similar issue that provides guidance in this matter is *Ramos v. USAgencies Casualty Insurance Co., Inc.*, 13-685 (La.App. 5 Cir. 2/26/14), 136 So.3d 338, wherein the trial court found that the plaintiff's testimony regarding injuries allegedly obtained in an accident were not credible and denied his claim. The plaintiff, Mr. Ramos, appealed, alleging "that the trial court erred when it permitted evidence of his immigration status, as this information was irrelevant

---

[3] In the instant matter, we are dealing with the Louisiana Code of Evidence rather than the Federal Rules of Evidence. The comments to La.Code Evid. art. 608(b), the statute dealing with attacking or supporting credibility by character evidence, and which is similar to Federal Rule of Evidence Article 608(b), provides:

(b) Paragraph B, like Federal Rule of Evidence 608(b), excludes extrinsic evidence of specific instances of conduct offered to attack the credibility of a witness. Unlike the Federal Rule, however, this paragraph follows Louisiana's traditional approach by also prohibiting cross-examination of a witness as to specific instances of his conduct (including vices or courses of conduct).

and prejudicial." *Id*. at 340. At trial, Mr. Ramos was questioned by the defense when he stated that he was born in Honduras. Defense counsel then asked Mr. Ramos about his immigration status wherein his counsel objected on the basis of relevancy. In response, defense counsel stated: "'I think it is relevant if someone will break the law to personally benefit it's an issue as it is in this case.'" *Id*. On appeal, the fifth circuit noted that the complained of evidence was irrelevant. It pointed out, however, that this case was tried before a judge rather than a jury, and that "a trial judge, unlike a jury, is well versed in the rules of evidence, and is, therefore, trained to give the appropriate weight to evidence and to evaluate evidence without bias." *Id*. at 341. As such, the fifth circuit found no merit in Mr. Ramos's assignment of error by stating the following:

> In the present case, we find that Mr. Ramos failed to prove that the trial judge did not act impartially because of Mr. Ramos's immigration status. During cross-examination of Mr. Ramos, there was only one question asked regarding his immigration status, and the issue of immigration was never raised again. In his appellate brief, Mr. Ramos makes conclusory allegations that after this question, the trial judge became biased as is evidenced by the trial court's holding Mr. Ramos in contempt of court based on his finding that Mr. Ramos committed fraud and perjury. Mr. Ramos has failed to present any factual basis for his claim other than an adverse judgment. From the record, it is clear that the trial court's ruling was not based on Mr. Ramos's immigration status, but rather on his belief that Mr. Ramos was not credible due to the inconsistencies in his testimony.

*Id*.

Just as in *Ramos*, we find that the State's questioning of Shaikh during cross-examination regarding his immigration status was irrelevant. However, we find that the trial court's subsequent instruction to the jury enabled it to give the appropriate weight to the evidence and evaluate the evidence without bias, just as the trial court in *Ramos*, thus rendering the error harmless. Accordingly, Shaikh's assignment of error is without merit in this regard.

22

Shaikh also contends that the trial court erred by allowing the introduction of Varela's testimony regarding Shaikh's incarceration over defense counsel's objection. As discussed above, Varela, who testified on behalf of Shaikh, stated that he was in the lobby of the sheriff's office on the day in question when A.G. arrived and allegedly heard her say "that she had run away and that the person that gave her a ride did not do anything to her, like touch her in any kind of inappropriate way." Shaikh takes issue with the State's questioning of Varela when it asked him how he knew Shaikh. Varela replied that he "met him while [he] was incarcerated" at the Beauregard Parish Sheriff's Office. The following colloquy ensued between them with respect to Shaikh's incarceration:

Q      And when was he arrested?

A      April 17, 2014.

Q      Okay, April 17, 2014. About how long has he been in jail?

A      Almost a year.

Following Varela's testimony, defense counsel objected and thereafter moved for a mistrial, stating: "The question that was asked that I would object to is, 'How long has he been in jail?' The grammatical structure of that sentence indicates that he's still in jail. So, 'How long has he been there?'" The trial court indicated that it thought the State asked how long Varela, and not Shaikh, had been incarcerated. Regardless, the trial court immediately instructed the jury to disregard any indication that Shaikh "is or has been or at any time was or is currently incarcerated."

In opposition, the State argues that even if evidence regarding Shaikh's incarceration was admitted in error, the error was harmless. We agree since Varela later explained on cross-examination that after the incident in the police station

lobby, which occurred on April 17, 2014, he was subsequently re-arrested in August of that same year and spent time in jail where he met Shaikh. Varela indicated that when Shaikh told him the reason for his incarceration, Varela remembered the previous incident which occurred in the sheriff's lobby on April 17, 2014. Given Varela's subsequent explanation, even if the trial court erred in this case, we find that Shaikh has not shown that the error contributed to the verdict since "[a]n error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error." *State v. Koon*, 96-1208, p. 9 (La. 5/20/97), 704 So.2d 756, 763, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 570 (1997). Accordingly, Shaikh's assignment of error is without merit in this regard.

## VI.   Sentencing

In his fifth assignment of error, Shaikh contends that the maximum sentences imposed, although partially suspended, are excessive and in violation of the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution.

Shaikh's assignment of error with respect to the sentence imposed for indecent behavior of a juvenile is moot given our reversal and vacating of same. On the other hand, simple kidnapping provides for a range of imprisonment of not more than five years, with or without hard labor. La.R.S. 14:45(B). Shaikh received the maximum sentence despite the trial court noting at the sentencing hearing that Shaikh had no criminal history. The trial court further discussed the range of punishment for Shaikh's offense by stating:

> Now, I'm not going to sentence Mr. Shaikh based upon what he might have done or what he could have done. He was convicted of these two charges based upon the evidence that was presented; and so

24

I'm going to sentence him based upon what he did do, not what he might have done. And I do not believe that that merits the maximum penalty of two maximum sentences run consecutive. It certainly deserves punishment, lengthy prison sentences to make sure that it doesn't happen again and that Mr. Shaikh understands that this kind of conduct is unacceptable.

When determining whether a sentence is excessive, the following standard is utilized:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

> [E]ven when a sentence falls within the statutory sentencing range, it still may be unconstitutionally excessive, and in determining whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has suggested that several factors may be considered:

>> [An] appellate court may consider several factors including the nature of the offense, the circumstances of—the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the

> trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.
>
> *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061.

> *State v. Decuir*, 10-1112, pp. 11-13 (La.App. 3 Cir. 4/6/11), 61 So.3d 782, 790-91.

*State v. Sauls*, 14-205, p. 4 (La.App. 3 Cir. 10/15/14), 149 So.3d 1005, 1008.

In this case, there was no evidence showing that Shaikh denied A.G. the opportunity to leave. There was no evidence that Shaikh possessed a criminal history during the fifteen years he resided in the United States. The five-year-sentence is also out of line with other sentences imposed in factually similar cases. Specifically, in *State v. Ballard*, 02-2431 (La.App. 4 Cir. 5/28/03), 848 So.2d 722, the fourth circuit found that the trial court did not abuse its discretion in sentencing the defendant to three years imprisonment. It stated that the defendant took a baby from her home without the mother's consent, took her to another location across the state, and hid her from the police under a pile of clothing. The fourth circuit noted that the trial court based its sentencing on the defendant's prior misdemeanor convictions. In *State v. Gill*, 441 So.2d 1204 (La.1983), the supreme court affirmed the trial court's judgment sentencing the defendant, who was found guilty on two counts of attempted simple kidnapping, to three years imprisonment at hard labor. The sentence was suspended on the condition that he serve one year in jail and obtain psychiatric treatment. In *State v. Thrasher*, 480 So.2d 850 (La.App. 2 Cir. 1985), the defendant bought an eight-year-old girl a hamburger in exchange for her promise to go with him to wash his truck. After she got into his truck and

instead of going to the car wash, the defendant took her into the woods, pulled down her pants, unzipped his pants, and attempted to force her to perform oral sex on him. The second circuit affirmed the trial court's judgment sentencing the defendant, who was convicted of simple kidnapping, to five years at hard labor.

Given the sentences imposed in the comparable cases, we find that the trial court abused its discretion by imposing the maximum sentence with respect to Shaikh's simple kidnapping conviction. Shaikh's sentence is, therefore, vacated and remanded to the trial court for resentencing in a manner consistent with this opinion. We further note that La.Code Crim.P. art. 881.4(A) allows this court to give direction to the trial court concerning the proper sentence. Considering the factors set out above, we suggest a sentence of imprisonment of two years for Shaikh's simple kidnapping conviction.

**DECREE**

Defendant, Fahim A. Shaikh's conviction for simple kidnapping is affirmed, although his simple kidnapping sentence is vacated and remanded for resentencing consistent with this opinion. Defendant, Fahim A. Shaikh's conviction and sentence for indecent behavior with a juvenile is reversed, vacated, and an order of acquittal is entered.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.**

27

STATE OF LOUISIANA

VERSUS

FAHIM A. SHAIKH

**THIBODEAUX, Chief Judge, dissenting in part.**

I agree with the majority that there was insufficient evidence to support a conviction for indecent behavior with a juvenile. I disagree with its conclusion that simple kidnapping was proven beyond a reasonable doubt.

Louisiana Revised Statutes 14:45(A)(2) requires an "unlawful purpose." The majority agrees that insufficient evidence exists to prove the crime of indecent behavior with a juvenile. Where is the "unlawful purpose" required by the statute? The majority hides it from us. There is a reason for that—it does not exist. The State, at trial, relied exclusively on the offense of "indecent behavior with a juvenile" as the "unlawful purpose" requirement to prove simple kidnapping. In an attempt to circumvent this requirement, the majority creates a jurisprudential fiction—the lack of a lawful purpose to supplant the statutory directive.

The majority rationalizes its conclusion by asserting that "picking up a runaway minor child and keeping her secreted for five hours without her legal guardian's consent . . . does not equate to a lawful purpose." However, the majority then inconsistently posits that "there was no evidence showing that defendant denied A.G. the opportunity to leave." If so, how does that amount to "keeping her [A.G.] secreted?" The majority somehow does not see this inconsistency and does not explain how this reasoning undermines its own rationale. Louisiana Revised Statutes 14:45(A)(2) focuses on an "unlawful

purpose;" it does not say anything about "does not equate to a lawful purpose," as the majority states.

The majority's reliance on *State v. Belcher*, 34,616 (La.App 2 Cir. 6/20/01), 793 So.2d 262, is misplaced. In *Belcher*, when the victim refused to get into the vehicle, the defendant attempted to entice her by offering her money if she got into the vehicle. Here, A.G. voluntarily accompanied Defendant.

A.G. admitted that she ran away from home without her mother's consent. She testified that she voluntarily got into the car and told Defendant she was spending the weekend at a friend's house. He agreed to take her there. She gave him directions, but on the way there she told him her friend would not be home yet. Defendant argues that there was no inducing, enticing, or decoying A.G. away without her parents' consent. She had left her home on her own accord, after being forbidden to do so. She was walking on the roadway pulling a suitcase behind her. She readily agreed to get into the car after she told Defendant she was going to her girlfriend's house and he offered a ride. She agreed to go to Mr. Majeed's apartment after Defendant said she could stay there while she waited for her friend to come home from school. The victim admitted that at no time did she ask to be let out of the car. She had ample opportunity to leave the vehicle when they stopped at Dairy Queen. Except for agreeing to buy her hair dye, there was no testimony he made any promises to her. She agreed that she had the opportunity to leave the apartment when Defendant left her alone to work upstairs and when he left to run an errand. She agreed that she had the opportunity to seek help or run away when they went to Wal-Mart. Thus, I have a difficult time attempting to fathom where and how Defendant "secreted" A.G. It just does not exist. Even the majority concedes this.

In sum, there was insufficient evidence to show that Defendant enticed, induced, or tricked the victim into getting in the car and accompanying him to Mr.

2

Majeed's apartment for an unlawful purpose. Therefore, there was insufficient evidence to sustain the verdict of simple kidnapping in this case. While Defendant exercised bad judgment and was not a model citizen, those less than admirable traits do not equate to criminal conduct.

For the foregoing reasons, I respectfully dissent in part.